Approved: _____
JULIANA N. MURRAY / RYAN B. FINKEL / PETER J. DAVIS
Assistant United States Attorneys

Before: HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York

**20 MAG 8409**

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

    - v. -

JASON MARTINEZ,
   a/k/a "Jay,"

                Defendant.

- - - - - - - - - - - - - - - - - - x

**SEALED COMPLAINT**

Violations of 21 U.S.C. § 846 and 18 U.S.C. §§ 1951, 924(c), and 2

COUNTY OF OFFENSE:
BRONX

SOUTHERN DISTRICT OF NEW YORK, ss.:

    KIERAN P. KEENAGHAN, being duly sworn, deposes and says that he is a Task Force Officer with the New York City Police Department ("NYPD") / Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Joint Robbery Task Force, and charges as follows:

**COUNT ONE**
(Narcotics Conspiracy)

    1. In or about May 2019, in the Southern District of New York and elsewhere, JASON MARTINEZ, a/k/a "Jay," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

    2. It was a part and an object of the conspiracy that JASON MARTINEZ, a/k/a "Jay," the defendant, and others known and unknown, would and did distribute and possess with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

    3. The controlled substance that JASON MARTINEZ, a/k/a "Jay," the defendant, conspired to distribute and possess with the intent to distribute was five kilograms and more of mixtures

and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

## COUNT TWO
(Conspiracy to Commit Hobbs Act Robbery)

4.   In or about May 2019, in the Southern District of New York and elsewhere, JASON MARTINEZ, a/k/a "Jay," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, MARTINEZ agreed with others to rob individuals of cocaine at gunpoint in the Bronx, New York.

(Title 18, United States Code, Section 1951.)

## COUNT THREE
(Firearms Offense)

5.   On or about May 29, 2019, in the Southern District of New York and elsewhere, JASON MARTINEZ, a/k/a "Jay," the defendant, during and in relation to a drug trafficking crime, namely, the narcotics conspiracy charged in Count One of this Complaint, knowingly did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm, which firearm was brandished.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii), and 2.)

## COUNT FOUR
(Narcotics Conspiracy)

6.   In or about May 2020, in the Southern District of New York and elsewhere, JASON MARTINEZ, a/k/a "Jay," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2

7. It was a part and an object of the conspiracy that JASON MARTINEZ, a/k/a "Jay," the defendant, and others known and unknown, would and did distribute and possess with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

8. The controlled substance that JASON MARTINEZ, a/k/a "Jay," the defendant, conspired to distribute and possess with the intent to distribute was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

9. I am a Task Force Officer with the NYPD / ATF Joint Robbery Task Force and have served in that role for approximately six years. I have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement officers and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

10. Since in or about May 2019, law enforcement has been investigating a drug trafficking organization (the "Puerto Rico DTO") that is believed to have shipped packages (the "DTO Packages[1]") containing more than a ton of cocaine from Puerto Rico into the continental United States, including to certain addresses in New York City, Florida, Connecticut, and Massachusetts, for subsequent distribution.

---

[1] The investigation has included the seizure of approximately 192 kilograms of Puerto Rico DTO cocaine from three of the DTO Packages (the "Seized DTO Packages") on or about June 5-6, 2019.

3

11. The investigation was initiated following a gunpoint robbery of at least approximately 100 kilograms of Puerto Rico DTO cocaine from a certain apartment in the Bronx, New York ("Apartment-1") on or about May 29, 2019 (the "Robbery"). The investigation has also focused on a drug trafficking organization operating in the Bronx (the "Bronx DTO") that coordinated the Robbery and distributes cocaine, including the Puerto Rico DTO cocaine, in and around New York City.

12. As described in further detail below, JASON MARTINEZ, a/k/a "Jay," the defendant, is a member of the Bronx DTO who participated in planning and executing the Robbery and in the subsequent sale and distribution of the cocaine that was taken during the Robbery (the "Robbery Cocaine"). In May 2020, MARTINEZ was arrested in Florida after he and associates attempted to purchase seven kilograms of cocaine from a confidential source working with the DEA, resulting in the seizure of nearly $200,000 in cash from the vehicle that MARTINEZ drove to the planned narcotics transaction.

The Robbery

13. Based on my involvement in this investigation, my review of surveillance video, documents, and reports, and my conversations with law enforcement officers and other individuals interviewed in connection with the investigation, I have learned, among other things, the following:

    a. Three DTO Packages (the "Apartment-1 Packages"), which, as described below, contained the Robbery Cocaine, were scheduled to be delivered to Apartment-1 in the Bronx by a particular shipping company (the "Shipping Company") on or about May 28, 2019, but the delivery was postponed due to an issue with access to the street on which Apartment-1 is located.

    b. At approximately 4:03 p.m. or about the following day, May 29, 2019, Daniel Rodriguez ("Rodriguez") and others retrieved the Apartment-1 Packages from a Shipping Company facility and took them to Apartment-1 (*i.e.*, the scene of the Robbery later that evening).

    c. Based on, among other things, the shipping weight-to-cocaine ratio of the Seized DTO Packages, which were similar in size and weight to the Apartment-1 Packages, law enforcement estimates that the Apartment-1 Packages contained at least approximately 100 kilograms of cocaine.

    d. After bringing the Apartment-1 Packages to Apartment-1, Rodriguez and others inside Apartment-1 packed kilograms of cocaine from the packages into duffel bags (the "Duffel Bags"). Law enforcement estimates that each Duffel Bag contained more than 20 kilograms of cocaine.

    e. At approximately 7:14 p.m., four individuals (the "Robbers") forced entry into Apartment-1 in order to take the cocaine.

    f. One of the Robbers struck an individual inside Apartment-1 in the head with a firearm, causing a laceration and bleeding.

    g. The Robbers removed approximately four or five of the Duffel Bags containing cocaine from Apartment-1 and fled.

    h. Surveillance video that recorded the vicinity of Apartment-1 shows approximately four individuals – *i.e.*, the Robbers[2] – fleeing from Apartment-1 at approximately 7:18 p.m. carrying the Duffel Bags. Based on my review of that video, and the way certain of the Robbers appeared to struggle carrying the bags, the Duffel Bags appeared to be heavily weighted. Based on my participation in this investigation, and as described above, I believe that each of the Duffel Bags contained kilogram quantities of cocaine.

    i. Surveillance video that recorded the vicinity of Apartment-1 shows one of the Robbers ("Robber-1") stopping at the passenger door of a black BMW with a Pennsylvania license plate that was parked across the street from Apartment-1 ("Car-1"). Robber-1 placed one of the Duffel Bags into Car-1 before continuing to flee on foot. Car-1 immediately drove away.

    j. At approximately 7:25 p.m. (*i.e.*, minutes after the Robbery occurred), an individual called 911 and reported, in sum and substance, that a robbery was taking place in Apartment-1.

    k. Rodriguez and others fled the scene of the Robbery in a car registered to a co-conspirator ("CC-1") who, as described in greater detail below, is believed to be a member of the Bronx DTO. Rodriguez fled with one of the Duffel Bags.

    l. Law enforcement officers responded to the scene of the Robbery shortly after the Robbers fled Apartment-1 carrying the Duffel Bags. During a search of Apartment-1, law enforcement

---

[2] The Robbers' faces are not visible on the surveillance video.

5

found, among other things, broken tables, blood stains, and a .40 caliber bullet casing.

      m. On the ground outside a window of Apartment-1, law enforcement officers recovered, among other things, two cellphones, including one cellphone belonging to Rodriguez (the "Rodriguez Phone"), and a one-kilogram brick of a white powdery substance, which tested positive for the presence of cocaine (the "Recovered Cocaine"). Based on my training and experience and participation in this investigation, I believe that the Recovered Cocaine fell out of one of the Duffel Bags while the Robbers were fleeing the scene of the Robbery.

      n. On or about January 14, 2020, a grand jury sitting in this District indicted multiple individuals in connection with their participation in the Puerto Rico DTO, Bronx DTO, and Robbery, including Rodriguez and Deejay White ("White"), who were charged with robbery, firearms, and narcotics offenses. *See United States v. Rodriguez et al.*, S4 19 Cr. 536 (PKC).

### Identification of Car-1

14. Based on my involvement in this investigation, I believe that Car-1, the vehicle used to transport one of the Duffel Bags filled with cocaine away from the Robbery, is used by White. Specifically, based on my review of documents, reports, law enforcement databases, subpoena returns, cellphones, and historical cellphone location information, and my conversations with other law enforcement officers, I have learned the following, among other things, about Car-1:

      a. Car-1 was parked on the street across from Apartment-1 from at least approximately 7:01 p.m. until approximately 7:18 p.m. on or about May 29, 2019, *i.e.*, the period during which the Robbery occurred, as described above.

      b. At approximately 7:19 p.m., approximately two seconds after Car-1 drove away with one of the Duffel Bags, surveillance video shows White fleeing from Apartment-1 carrying one of the Duffel Bags.

      c. Based on my review of law enforcement databases, I know that Car-1 is registered in the name of White's spouse ("Spouse-1"). I further know that Car-1 is affiliated in law enforcement databases with White; specifically, that White was the driver of Car-1 on or about June 1, 2018, when a summons was issued to White for a traffic violation.

6

        d.  In addition, law enforcement conducting surveillance of White's residence located in Chappaqua, New York observed Car-1 parked in the driveway of that residence on multiple occasions from at least on or about July 2, 2019 (*i.e.*, approximately one month after the Robbery) until at least on or about November 25, 2019.

<u>Post-Robbery Investigation and Identification of the Defendant</u>

    15.  Based on my involvement in this investigation, my review of surveillance video, documents, and reports, and my conversations with law enforcement officers, I have learned, among other things, the following:

        a.  On or about November 25, 2019, law enforcement arrested White on a complaint charging him with robbery, narcotics, and firearms offenses.

        b.  In conjunction with White's arrest, law enforcement seized two cellphones from White ("White Cellphone-1" and "White Cellphone-2," collectively, the "White Cellphones"), and subsequently searched those phones.

    16.  Based on my involvement in this investigation and my review of the contents of the White Cellphones, documents, and records, including records obtained pursuant to 18 U.S.C. § 2703(d), I have learned, among other things, the following:

        a.  A particular cellphone number (the "Martinez Cellphone") is saved in the contacts of White Cellphone-1 as "Jay My Bro 182." The Martinez Cellphone is registered in the name of "Jason Martinez," at a particular address in the Bronx associated in law enforcement databases with JASON MARTINEZ, a/k/a "Jay," the defendant. Attachments to text messages exchanged between the Martinez Cellphone and White Cellphone-1 include photographs depicting White and MARTINEZ together. Based on, among other things, the foregoing, law enforcement believes that the Martinez Cellphone is used by MARTINEZ.

        b.  A particular cellphone number (the "Spouse-1 Cellphone") that is billed to White is saved in the contacts of the White Cellphones as "LuvOfMyLife," is associated with the email account used by Spouse-1, and is believed to be used by Spouse-1 (*i.e.*, White's spouse).

        c.  In or about May 2020, White Cellphone-1 exchanged text messages with a particular cellphone number (the "CC-1

7

Cellphone"), which is subscribed to in the name of, and at an address associated in law enforcement databases with, CC-1.

  d. Law enforcement identified two additional cellphone numbers in White Cellphone-1 ("White Cellphone-3" and "White Cellphone-4"), which White identified in text messages with various individuals as White's "work" numbers and at which numbers White directed individuals to contact him, including in a text message White sent the day after the Robbery. Based on the foregoing, law enforcement believes White Cellphone-3 and White Cellphone-4 were used by White, including at around the time of the Robbery.

  17. Based on my involvement in this investigation, my review of the contents of the White Cellphones, documents, records, reports, and surveillance video, and my conversations with law enforcement officers and other individuals interviewed in connection with this investigation, I have learned, among other things, the following:

  a. On or about May 28, 2019 (*i.e.*, the day before the Robbery) at approximately 1:03 p.m., the Martinez Cellphone called the CC-1 Cellphone. The call lasted approximately 43 seconds.

  b. At approximately 1:10 p.m. that day, the Martinez Cellphone sent the following text messages to White Cellphone-1: "Start coming" and "He said it's today." White Cellphone-1 responded: "I'm on my way." Approximately four minutes later, White Cellphone-1 wrote to the Martinez Cellphone: "Kopy throwing sweatsuit on now."

  c. At approximately 6:32 p.m., White Cellphone-1 texted the Martinez Cellphone a video that appears to have been recorded from the front driver's seat of a car that was parked on the street outside Apartment-1, *i.e.*, the apartment where the Robbery took place the next day. The video scans the street, zooms in on the front door of Apartment-1, and then scans back across the street to focus on two individuals standing in the street. Based on my review of the metadata of the video, I have learned that the video was recorded at approximately 4:08 p.m. on or about May 28, 2019.

  d. On or about May 28, 2019, the CC-1 Cellphone was in frequent contact with cellphones used by JASON MARTINEZ, a/k/a "Jay," the defendant, Rodriguez, and White, among others. For example:

8

        i.    At approximately 3:18 p.m., the CC-1 Cellphone called the Rodriguez Cellphone (*i.e.*, the cellphone that was later recovered from the scene of the Robbery). The call lasted approximately 48 seconds.

        ii.    At approximately 3:58 p.m. (*i.e.*, approximately 10 minutes before White appears to have recorded the video of him casing Apartment-1, as described above), White Cellphone-3 called the CC-1 Cellphone.

        iii.    At approximately 4:02 p.m., the CC-1 Cellphone called the Rodriguez Cellphone. The call lasted approximately 10 seconds.

        iv.    At approximately 4:05 p.m., the CC-1 Cellphone called White Cellphone-3. The call lasted approximately 67 seconds.

    e.    Less than approximately 30 seconds after White Cellphone-1 sent the video casing Apartment-1 to the Martinez Cellphone, White Cellphone-1 texted the Martinez Cellphone: "Wht u want me to do bro??," followed less than approximately two minutes later by another text message reading: "???." The Martinez Cellphone texted back: "Noting he said might be tomorrow" and "He gonna call me."

    18.    Based on my involvement in this investigation, my review of documents, reports, audio recordings, and subpoena returns, and my conversations with law enforcement officers, I have learned, among other things, the following:

    a.    As described above, the Apartment-1 Packages were scheduled to be delivered to Apartment-1 on or about May 28, 2019, but the delivery was postponed. *See supra* ¶ 13(a).

    b.    At approximately 2:18 p.m. on or about May 28, 2019 (*i.e.*, approximately one hour after JASON MARTINEZ, a/k/a "Jay," the defendant, texted White, *see supra* ¶ 17(a)), an individual called the Shipping Company to arrange for the Apartment-1 Packages to be picked up from the Shipping Company facility. The call was recorded.

    19.    Based on my involvement in this investigation, as described in greater detail below, I believe that JASON MARTINEZ, a/k/a "Jay," the defendant, continued coordinating with White, as well as CC-1, Spouse-1, and others, in furtherance of the Robbery on or about May 29, 2019, both before and after the Robbery that

evening. Specifically, based on my review of documents, reports, law enforcement databases, subpoena returns, cellphones, and historical cellphone location information, and my conversations with other law enforcement officers, I have learned, among other things, the following:

      a.    At approximately 4:16 p.m., during an outgoing call to the Martinez Cellphone, White Cellphone-1 connected to a cell site located at the approximate location of an apartment building located on Southern Boulevard in the Bronx in which a co-conspirator ("CC-2") resides (the "Southern Boulevard Building").

      b.    At approximately 5:43 p.m., during an incoming call from the Martinez Cellphone, the Spouse-1 Cellphone connected to a cell site located in the vicinity of Apartment-1, *i.e.*, the location of the Robbery.

      c.    At approximately 5:47 p.m., during an incoming call from the CC-1 Cellphone, the Martinez Cellphone connected to a cell site located in the vicinity of Apartment-1.

      d.    At approximately 7:08 p.m., during an outgoing call to the Martinez Cellphone, the Spouse-1 Cellphone connected to a cell site located in the vicinity of Apartment-1.

      e.    As described above, the Robbery at Apartment-1 took place between approximately 7:14 p.m. and 7:18 p.m.

      f.    At approximately 7:47 p.m., during an outgoing call to the Martinez Cellphone, the Spouse-1 Cellphone connected to a cell site located at the approximate location of the Southern Boulevard Building.

      g.    Between approximately 10:17 p.m. and 10:19 p.m., during an exchange of text messages and FaceTime calls with the CC-1 Cellphone, White Cellphone-1 connected to a cell site located in the vicinity of Rodriguez's apartment.

20.    Based on my training and experience and my involvement in this investigation, I believe the above indicates, among other things, the following:

      a.    As of at least the morning of May 28, 2019, the Apartment-1 Packages were scheduled to be delivered to Apartment-1. *See supra* ¶¶ 13(a), 18(a). Text messages between JASON MARTINEZ, a/k/a "Jay," the defendant, and White on or about May

28, 2019 discussed, among other things, the timing of the planned Robbery. *See supra* ¶ 17(b), (c), and (e).

  b. On or about May 29, 2019, while in the vicinity of the Southern Boulevard Building (*i.e.*, the building where CC-2 resides), White and Spouse-1 communicated with MARTINEZ, who was using the Martinez Cellphone. *See supra* ¶ 19(a) and (b).

  c. White and Spouse-1 then traveled to the vicinity of Apartment-1 (*i.e.*, the location of the Robbery) and, approximately six minutes before the Robbery, Spouse-1 called MARTINEZ on the Martinez Cellphone. *See supra* ¶¶ 14(a) and (b), 19(d).

  d. Spouse-1 fled the scene of the Robbery with a Duffel Bag stolen during the Robbery. *See supra* ¶ 13(d) and (i). Less than approximately 30 minutes after the Robbery, again from the vicinity of the Southern Boulevard Building, Spouse-1 called MARTINEZ on the Martinez Cellphone. *See supra* ¶¶ 13(d) and (i), 19(f).

<u>November 25, 2019 Seizure</u>

  21. Based on my involvement in this investigation, my review of cellphone records, historical cellphone location information, documents, and reports, and my conversations with law enforcement officers and other individuals interviewed in connection with the investigation, I have learned, among other things, the following:

  a. Between in or about April 2019 and in or about March 2020, during more than approximately 580 calls – including calls with the CC-1 Cellphone, White Cellphone-1, and the Spouse-1 Cellphone – the Martinez Cellphone connected to cell sites located in the approximate vicinity of the Southern Boulevard Building.

  b. On or about November 25, 2019, law enforcement officers executed a judicially authorized search warrant at CC-2's apartment inside the Southern Boulevard Building – where, as described above, participants in the Robbery appear to have gathered before and after the Robbery. *See supra* ¶ 19(a), (f).

  c. During that search, law enforcement recovered approximately $250,000 in U.S. currency that I believe, based on my training and experience and my participation in this investigation, includes the proceeds of the sale and distribution of cocaine by the Bronx DTO.

### Florida Arrest

22. As described in greater detail below, on or about May 28, 2020, the Hialeah Police Department arrested JASON MARTINEZ, a/k/a "Jay," the defendant, and others, in or around Hialeah, Florida, for attempting to purchase from a confidential source (the "CS"[3]) approximately seven kilograms of cocaine for redistribution. At the time of MARTINEZ's arrest, law enforcement recovered approximately $192,570 in U.S. currency from inside a car registered to, and driven by, MARTINEZ ("Car-2").

23. Based on my involvement in this investigation, my review of documents, records, reports, text messages, audio and video recordings, and historical cellphone location information, and my conversations with other law enforcement officers, I have learned, among other things, the following:

    a. Starting on or about May 23, 2020, certain co-conspirators ("CC-3" and "CC-4") of JASON MARTINEZ, a/k/a "Jay," the defendant, negotiated the purchase of approximately seven kilograms of cocaine (the "Florida Cocaine") from the CS, during text messages and recorded calls with the CS.

    b. On or about May 27, 2020, CC-3 texted the CS and advised the CS, in substance and in part, that CC-4 and another co-conspirator ("CC-5") were ready to purchase the Florida Cocaine for approximately $176,000. Later that day, CC-4 called the CS and stated, in substance and in part, that the transaction would need to take place the following day, because the money was coming down from New York. The call was recorded. As described below, MARTINEZ transported money from in or around the Bronx to Florida for purposes of purchasing the Florida Cocaine.

    c. From approximately May 26 to May 27, 2020, MARTINEZ drove from the Bronx to Florida.

        i. Since at least in or about January 2020, law enforcement has observed MARTINEZ driving Car-2 on numerous occasions, including in and around MARTINEZ's residence in the Bronx.

---

[3] The CS has been assisting the DEA for approximately 23 years and has been assisting the Hialeah Police Department for approximately five years. The CS is paid for the CS's work on behalf of law enforcement. Information that the CS has provided has been corroborated by independent evidence and deemed reliable by law enforcement.

ii.  At approximately 9:27 p.m. on or about May 26, 2020, the Martinez Cellphone connected to a cell site located in the Bronx.

iii.  At approximately 2:58 a.m. on or about May 27, 2020, a license plate reader identified Car-2 driving southbound on I-295, crossing from New Jersey into Delaware, which I believe, based on my training and experience, is consistent with MARTINEZ traveling from New York City to Florida – where MARTINEZ was arrested the following day, as described below.

d.  On or about May 28, 2020, CC-3 called the CS to confirm, in substance and in part, that CC-4 had the money to purchase the Florida Cocaine. That call was recorded. That afternoon, CC-3, CC-4, CC-5, and another co-conspirator ("CC-6") arrived to conduct the planned narcotics transaction at an agreed-upon location in a car with Florida license plates, and MARTINEZ and another co-conspirator ("CC-7") arrived at the location in Car-2 (*i.e.*, MARTINEZ's car).

e.  The CS asked CC-4 to see the money, and CC-4 replied, in substance and in part, that the money was in a hidden compartment in Car-2. The CS and CC-4 then walked to the driver's side of Car-2, where MARTINEZ was seated. CC-7 handed MARTINEZ a gym bag ("Bag-1"), and MARTINEZ opened Bag-1 to show the CS a quantity of U.S. currency that was bundled and wrapped in rubber bands which, based on my training and experience, I know to be a manner of packaging money that is consistent with narcotics trafficking.

f.  MARTINEZ and several of his co-conspirators followed the CS to a separate location, where MARTINEZ parked Car-2 and MARTINEZ and CC-5 followed the CS into a room inside the building ("Room-1").

g.  Based on my review of video and audio recordings from inside Room-1, I have learned that the CS produced, and MARTINEZ examined, two one-kilogram bricks of what appeared to be cocaine (and which in fact contained cocaine mixed with sham narcotics designed to look like cocaine). The CS cut open the packaging on one of the bricks, and MARTINEZ brought the brick up toward his nose which, based on my training and experience, I understand to be a manner in which individuals inspect cocaine.

h.  After that interaction inside Room-1, MARTINEZ was arrested.

        i.    Following MARTINEZ's arrest, law enforcement conducted a judicially authorized search of Car-2, *i.e.*, the car that MARTINEZ drove to the planned cocaine transaction. Law enforcement recovered Bag-1 from the front seat of Car-2 and recovered approximately $18,000 in U.S. currency from inside Bag-1. Law enforcement also located and opened a hidden compartment in the center console of Car-2 (the "Trap") and recovered from inside the Trap, among other things, approximately $174,570 in U.S. currency. As discussed above, the agreed-upon purchase price for the Florida Cocaine was approximately $176,000. The money in Bag-1 and in the Trap was bundled and wrapped in rubber bands which, based on my training and experience and as noted above, I know to be a manner of packaging money that is consistent with narcotics trafficking.

    WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of JASON MARTINEZ, a/k/a "Jay," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

*s/ Kieran P. Keenaghan /oTW*
KIERAN P. KEENAGHAN
Task Force Officer *Badge No. 6589*
NYPD/ATF Joint Robbery Task Force

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 4.1 and 41(d)(3), this
10th day of August, 2020.

_____
THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

14